# In the United States Court of Federal Claims

No. 17-228C
(Filed:  November 8, 2017)*
**\*Opinion was originally filed under seal on November 1, 2017**

<table>
<tr><td>―――――――――――――――――――</td><td>)</td><td></td></tr>
<tr><td>TODD G. EMOTO,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td>Military Retirement; Payment Grade;</td></tr>
<tr><td></td><td>)</td><td>Motion for Judgment on the</td></tr>
<tr><td>v.</td><td>)</td><td>Administrative Record; Sections 133 and</td></tr>
<tr><td></td><td>)</td><td>134 Article 15 Uniform Code of Military</td></tr>
<tr><td>THE UNITED STATES,</td><td>)</td><td>Justice; Adultery and Conduct</td></tr>
<tr><td></td><td>)</td><td>Unbecoming an Officer; Review of Army</td></tr>
<tr><td>Defendant.</td><td>)</td><td>Board for Corrections of Military Records</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>―――――――――――――――――――</td><td>)</td><td></td></tr>
</table>

*Cheryl Van Ackeren*, Tacoma, WA, for plaintiff.

*Margaret J. Jantzen*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Chad A. Readler,*  Acting Assistant Attorney General, and *Robert E. Kirschman, Jr.,* Director, and *L. Misha Preheim*, Assistant Director, Commercial Litigation Branch, for defendant.  *Shanna L. Cronin*, Major, US Army, U.S. Army Litigation Division, Fort Belvoir, VA, of counsel.

### OPINION AND ORDER

**FIRESTONE**, *Senior Judge.*

On February 16, 2017, plaintiff Todd G. Emoto ("plaintiff or Mr. Emoto") filed this action challenging the Army Board for Correction of Military Records' ("ABCMR") decision to deny his application to correct his military records.  Plaintiff's challenge concerns the ABCMR's decision not to change his retirement status from pay grade O – 4 to pay grade O – 5 or to correct his record by removing a non-judicial punishment issued

under Article 15 of the Uniform Code of Military Justice ("UCMJ"),[1] removing a General

Officer Memorandum of Reprimand ("GOMOR"),[2] and reinstating his Special Forces

Tab.[3]  This case is before the court on the parties' cross motions for judgment on the

administrative record pursuant to Rule 52.1 of the Rules of the United States Court of

Federal Claims ("RCFC").  The motions are fully briefed and oral argument was held on

September 28, 2017.  For the reasons discussed below, the plaintiff's motion for

judgment on the administrative record is **DENIED** and the government's cross motion

for judgment on the administrative record is **GRANTED**.

## I.     Background

### A.     Request for Retirement

In April 2012, plaintiff, then a lieutenant colonel (LTC) in the Army, and former

member of the Special Forces, requested voluntary retirement from active duty. AR 173.

Plaintiff was officially retired from active duty on June 30, 2012. AR 163.  Prior to his

retirement, plaintiff was the subject of an investigation in 2011 to determine whether he

had engaged in adultery and other conduct unbecoming an officer. AR 186-7.[4]  As a

---

[1]As discussed in detail, Mr. Emoto was charged with conduct unbecoming an officer and gentleman and adultery under sections 133 and 134, respectively, under Article 15 of the UCMJ. Article 15 of the UCMJ is titled "[c]ommanding officer's non-judicial punishment." *See* 10 U.S.C. § 815.

[2]The General Officer Memorandum of Reprimand was an administrative procedure taken against plaintiff and was not intended as punishment under the UCMJ. *See* AR 171.

[3]Plaintiff's award of a Special Forces Tab was rescinded on November 4, 2011. *See* AR 108.

[4] To be found to have committed adultery under Section 134, the military requires three elements of proof: "(1) [t]hat the accused wrongfully had sexual intercourse with a certain person; (2) [t]hat, at the time, the accused or the other person was married to someone else; and (3) [t]hat, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces." *Manual for Courts-Martial United States,* IV-103.

result of that investigation, disciplinary action was taken against the plaintiff who was at the time an LTC. AR 22, 97, 100, 101.  Plaintiff received an Article 15 non-judicial punishment, AR 97, a letter of reprimand ("GOMOR"), AR 100, and the removal of his Special Forces Tab, AR 101.  Because of his record, plaintiff was retired in the grade of Major, O – 4, instead of LTC, O – 5. AR 35, 103.  At the time of his retirement, plaintiff had more than twenty years of service and the highest rank he achieved was LTC, O – 5 on October 1, 2008.  AR 165, 253.

### B.     The Investigation

The investigation into plaintiff's behavior grew out of a complaint made in 2011 by one of the plaintiff's subordinates, Sergeant First Class Daniel White ("SFC White"). AR 18.  SFC White alleged that plaintiff had "an inappropriate sexual relationship with . . . SFC White's wife." *Id*.  Col. Brian R. Vines was appointed as Investigating Officer ("IO") pursuant to Army Regulation 15 – 6 and 735 – 5, to "conduct an informal investigation concerning the allegations made by SFC Daniel M. White regarding [plaintiff]." AR 186.

Specifically, the IO was to consider: (1) whether the plaintiff "engage[d] in an adulterous relationship with SFC White's wife," and (2) the plaintiff "engage[d] in any conduct that could be construed as service discrediting, prejudicial to the good order and discipline, or unbecoming of an officer." *Id*.  During the investigation, the IO interviewed

---

To be found guilty of conduct unbecoming an officer and gentleman under Article 133, the military requires proof "(1) [t]hat the accused did or omitted to do certain acts; and (2) [t]hat, under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman. *Manual for Courts-Martial United States,* IV-99.

five people, including SFC Dan White and his wife (Mrs. . . .White); plaintiff's wife

(Mrs. . . . Emoto); SFC Keith Austin (SFC Austin) and SFC Austin's son (…). AR 154.

Plaintiff invoked his right to remain silent and did not provide a sworn statement. *Id.* As

discussed below, the investigation involved two time periods, 2001 and 2011. AR 154-

58.

### 1.    2001 Conduct

Plaintiff's 2001 misconduct, which he does not apparently dispute, AR 172 and

Pl.'s Mot. for J. on the Admin R. (MJAR) 12, involved a sexual relationship that he and

his wife, Mrs. Emoto, had with SFC White's wife, while SFC White was deployed to

Bosnia in 2001. AR 19.  According to Mrs. Emoto's Facebook message to SFC White,

this relationship included two "threesomes." AR 734.  In 2001, SFC White was under

plaintiff's command. AR 34; AR 154. Specifically, from May 30, 1998 through January

17, 2001, plaintiff was assigned as Team Leader in B Company, 3rd Battalion, 1st Special

Forces Group (Airborne) to Operational Detachment, Alpha (ODA) 192. AR 154.  SFC

White was also assigned to ODA 192 during this period of time.  AR 154.

In his July 28, 2011 statement to the IO, SFC White stated that he first learned that

his wife and plaintiff had a sexual relationship in April 2011 when he received a

Facebook message from Mrs. Emoto describing the 2001 sexual encounters.[5]  AR 188.

---

[5] The IO collected the following Facebook messages sent by Mrs. Emoto to SFC White on April 17, 2011 admitting to a sexual relationship ("threesomes") between herself, plaintiff, and Mrs. White while SFC White was deployed sometime between 2000 and 2001.

> **Mrs. Emoto:** "Hi Dan – heard ya'lls news. Hope it's for the best for both of you."
> **Daniel White:** "It is, thanks. I might see yall in Hawaii, not sure if I am gonna go on the cruise by myself, but Honolulu, . . . yeah! maybe both, who knows. take care"

Mrs. White denied having a sexual relationship with plaintiff in the sworn statement she provided to the IO on July 28, 2011. AR 196-97.  When asked whether she was aware of the Facebook message Mrs. Emoto sent to SFC White about engaging in threesomes with plaintiff, Mrs. White replied, "SFC White told me in a text message that he suspected that we were making out and our son had come down stairs." AR 197.  Mrs. White also stated that "SFC White is mad and jealous.  He is looking to place blame for our divorce. . . . I believe he targets [plaintiff] because he gives me advice." *Id.*

Mrs. Emoto provided a sworn statement to the IO on July 28, 2011. AR 199-200. Mrs. Emoto also denied having a threesome with plaintiff and Mrs. White. AR 200.  She stated that "[t]he Facebook message . . . that explained the ocurrance [sic] of a threesome between plaintiff, [Mrs.] . . . Emoto, and [Mrs.] …White were false and motivated by anger during a difficult divorce." *Id.*

---

**Mrs. Emoto:** " There's something I've wanted to tell you for a long time, and so without further ado, here it is. [Plaintiff], [Mrs. White] and I had a threesome during one of your deployments. It was back when you guys still lived on post, so a while ago now obviously. I got railroaded into this by [plaintiff], who had his goals set. I felt particularly crappy about the fact that you had asked [plaintiff] to take care of [Mrs. White], since this was obviously not what you had in mind. To make matters worse, Madden came downstairs while [plaintiff] and [Mrs. White] were making out (I really wasn't into this), and exclaimed 'Don't kiss him.' [Mrs. White] obviously had to take [Madden] back upstairs and get him back to sleep. She came back down, apologized for the interruption, and jumped back into things. We had a total of two encounters, the second at my house. I kept telling [plaintiff] how wrong it all was, but he wouldn't listen. So, I have carried this for years now, and have always thought you deserved to know."
**Daniel White:** "Thank you"
AR 204.

Although plaintiff did not give the IO a sworn statement, later in his written rebuttal to the GOMOR, plaintiff admitted to a sexual relationship between himself and Mrs. White in 2001. AR 95.

### 2.      2011 Conduct

The IO also reviewed evidence regarding a continuing relationship between plaintiff and Mrs. White during his 2011 interviews.  AR 20.  In a statement made on July 28, 2011, SFC White explained that he had confronted plaintiff at SFC White's home on April 26, 2011 and that the plaintiff "admitted to me he had been . . .[ having sex with] my wife since 2001 and in the present 2011." AR 188-89.  When asked what evidence he had of their 2011 sexual involvement, SFC White said that, in addition to the messages sent by Mrs. Emoto describing their relationship and plaintiff's admission of a sexual relationship on April 26, 2011, his wife had also admitted to the affair in a separate conversation.  AR 189.  He also noted that he had seen plaintiff and Mrs. White together on several occasions.  *Id.*

In her July 28, 2011 statement, Mrs. White described her current relationship with plaintiff as "friends that do things together (dinner, movies, children are playmates)." AR 197.  Mrs. White also stated during her July 28, 2011 interview that SFC White "currently lives with a 26 year old woman." *Id.*  An August 11, 2011 memorandum documents the statements made by Mrs. White during a second interview on August 4, 2011. AR 205-6.  According to the memorandum, Mrs. White said that "the Emoto family stayed at the White residence for a couple of days prior to the Emoto family's move to Virginia" between December 2010 and January 2011.  AR 205.  After the Emoto

family left for Virginia, Mrs. White sent plaintiff a text message saying, "I miss you." AR 206.  Mrs. White explained that she sent the text message to plaintiff because "she missed the support structure of having him around." AR. 206.  Mrs. White also confirmed that she had been storing the plaintiff's truck at her house since January 2011. *Id.*

During the interview on August 4, 2011, "Mrs. White stated that she, [plaintiff], her son . . . (age 13), and [plaintiff's] daughter . . . (Age 3) would get together for playdates." AR 205-06.  "When asked for clarification, Mrs. [White] stated that they would meet at her house or [plaintiff's] and then go bowling." AR 206.  During that same interview, "Mrs. White stated that it is common for spouses and team members to go out and do things one on one without having others around, yet did not name any other team members that she spent time alone with." *Id*.  She also stated that "she was at dinner with [plaintiff] on 26 April 2011, the night SFC White confronted [plaintiff]." *Id*.

SFC Austin also made a sworn statement on July 28, 2011 regarding the night that plaintiff was confronted by SFC White. AR 201-202.  SFC Austin stated that he and SFC White had been on the phone talking to each other about the next day's work activities when SFC White heard a knock on his front door. AR 201-202.  According to SFC Austin, SFC White said "that son of bitch is at my door." AR 201.  SFC Austin explained that he was already aware of SFC White's "marital situation." *Id*.  SFC Austin then stated that SFC White put him on speaker phone so that SFC Austin and his son could hear the conversation between SFC White and plaintiff. *Id*.  According to SFC Austin's statement, SFC White told plaintiff that he felt "threatened" and showed plaintiff the gun that he was carrying. *Id*.  Then SFC Austin stated that he heard SFC White ask plaintiff

"how long have you been . . . [having sex with] my wife?" to which plaintiff replied "since 2001. I have been [having sex with] . . . your wife since 2001." *Id*.  SFC Austin further stated that he heard SFC White say to plaintiff that plaintiff "needed to tell all the people on their old team what he had done." AR 202.  When plaintiff said "I can't do that," SFC Austin stated that he then heard SFC White say that "if I see you anywhere at group or the PX together with my wife I'm going to tell everyone 'Look there's the Col. that's . . . [having sex with] my wife.'" *Id.*

SFC White issued a second statement made on August 11, 2011, in which he stated that "at no time . . . did I point a weapon at [plaintiff's] head, however[,] as I was walking downstairs to the bar, I unholstered my weapon and told [plaintiff] that '[j]ust so you know, I feel threatened in my own home' and reholstered my weapon.  At no time did I point the weapon at, or place it up to [plaintiff's] head." AR 191.

SFC White also stated in his August 11, 2011 statement that he received a text message on April 26, 2011,  from Mrs. Emoto in which she stated: "[Mrs. White] was obviously catering to [plaintiff] in my presence and I got all kinds of [weird] vibes from the two of them.  She ([ Mrs.] White) texted [plaintiff] while we were in Virginia and told [plaintiff] she missed him – not us, not . . . him. I haven't talked to Trish since we left back in January as I do not trust her. [Plaintiff] is not your friend, he has badmouthed you every chance he got, and still does." AR 191.  Subsequently on July 19, 2011 Mrs. Emoto texted SFC White asking, "What are you doing?" *Id*.  In his statement, SFC White explained that he assumed she was talking about bringing the affair between [plaintiff] and Mrs. White to the attention of his Chain of Command. *Id.*  When he spoke to her on

the phone, she asked him "to keep in mind that this is her financial stability, I have one kid and one on the way." *Id.* Earlier, in her July 28, 2011 statement, Mrs. Emoto stated that plaintiff had told her that "SFC White held a gun to his head while confronting him about the Facebook message." AR 200.

### 3. The IO Findings

Based on the evidence summarized above, the IO found that plaintiff and Mrs. White "have had an inappropriate sexual relationship ('threesomes' with [Mrs. Emoto] and a continued relationship) in the past and currently have, at minimum, an inappropriate relationship as friends (going to dinner, the movies, the gym, and bowling)." AR 20.

The IO went on to find that "[e]ven in the absence of a physical component to their relationship at the present time, it is inappropriate for a married officer to be going on dates with the married spouse of one of his subordinates." *Id*. The IO determined that plaintiff's continued relationship with Mrs. White after his confrontation with SFC White demonstrated "an immense lapse in judgment on [plaintiff's] part." *Id*. Additionally, the IO determined that plaintiff had not been threatened by SFC White. AR 21. Regarding the confrontation between plaintiff and SFC White on April 26, 2011, the IO concluded that "[t]here is not enough evidence to confirm that SFC Dan White placed a gun to the head of [plaintiff]." *Id*. "SFC White admits to having a gun on his person at the time, but denied pointing it at [plaintiff] or threatening him." *Id*. While "Mrs. Emoto did not witness the confrontation," she "alleged that during the confrontation on 26 April 2011, SFC White placed a gun to the head of [plaintiff], an allegation she heard from

[plaintiff]." *Id*.  Furthermore, SFC Austin and his son did not hear "anything which would indicate SFC White was pointing a weapon at [plaintiff]," and "[plaintiff] did not report any such incident to his command or law enforcement authorities." *Id*.

Based on his consideration of the evidence and his evaluation of witness credibility, discussed below, the IO determined by a preponderance of the evidence that then plaintiff had violated Article 134 – Adultery, Article 134 – Conduct Prejudicial to Good Order and Discipline, Article 133 – Conduct Unbecoming an Officer and a Gentleman, and Article 120 – Indecent Acts. AR 21.  The IO determined that plaintiff had committed adultery in violation of Article 134 stating, "[plaintiff] and [Mrs. White] engaged in a sexual relationship while [plaintiff] was SFC White's team leader." *Id*.  The IO determined that [plaintiff] had engaged in conduct prejudicial to good order in violation of Article 134 by "maintaining a close personal (and likely sexual) relationship with [Mrs. White] the wife of a subordinate NCO, is the very definition of conduct prejudicial to the good order and discipline." *Id*.  The IO determined that [plaintiff] violated Article 133- conduct unbecoming an officer and gentleman by stating that "[t]he UCMJ defines such conduct as that which 'seriously compromises the officer's character as a gentlemen … or action … which seriously compromises the person's standing as an officer ….' [plaintiff's] decision to engage in a close personal relationship (and likely a sexual relationship) with the wife of a subordinate NCO is clearly conduct that is in violation of this article." *Id*. The IO noted that "[t]he UCMJ defines 'indecent acts' as 'that form of immorality relating to sexual impurity that is not only grossly vulgar, obscene, and repugnant to common propriety, but also tends to excite lust and deprave

the morals with respect to sexual relations.'"  The IO found that "engaging in a

'threesome' is a sexual act within the UCMJ definition of 'indecent.'" AR 21-22.  He

also stated that "SFC White and [plaintiff] both engaged in sexual relations with two

prostitutes in Thailand.  While this conduct violates several parts of the UCMJ, these acts

occurred beyond the statute of limitations." AR 22.

### 4.    IO Credibility Determinations

In reaching his findings, the IO made the following determinations regarding

credibility.  He determined that Mrs. White's denial of a relationship with [plaintiff] was

not credible. The IO found "[Mrs. White's] statements to be of questionable veracity."

AR 20.  The IO explained that "[Mrs. White] and SFC White are currently going through

a divorce.  This provides [Mrs. White] motive to minimize her extramarital affairs.  At

several points during the interview, she contradicted herself and made statements which

contradicted other witnesses.  In both interviews with [Mrs. White] she describes a very

close relationship with [plaintiff] and describes interactions (movies, dinner, and gym)

that are more common for couples to participate in compared to completely platonic

friends." *Id*.

The IO also discounted much of Mrs. Emoto's testimony and determined that

"Mrs. Emoto's motive to fabricate is stronger than any of the other witnesses," because

"Mrs. Emoto stands to collect a substantial portion of her husband's retirement" and

"substantiated allegations" could result in "the full loss of retirement benefits." *Id*.

Furthermore, the IO noted that "Mrs. Emoto's statements were contradicted by several

other witnesses." AR 20-21.

Specifically, the IO noted that when Mrs. Emoto was asked about her Facebook message to SFC White regarding the threesome

> [M]rs. Emoto denied the threesome occurred and claimed the message was simply an attempt to emotionally hurt her estranged husband. This simply does not make sense. While accepting that an angry, estranged spouse could go to great lengths to emotionally hurt their spouse, it defies logic that she would include herself in the slander. Finally, it does not make sense that she would not have told SFC White that the confession was a lie. After all, he was the one most affected by the 'lie.'

AR 21.

The IO could not find a "motive for SFC White to fabricate his story." *Id.* The IO explained that "SFC White has proven to be extremely forthright even with regards to the most embarrassing parts of his past (e.g., encounters with prostitutes, extramarital affairs, sexual threesomes, etc.)." *Id.*

## 5. IO's Recommendations

Based on his findings, the IO made several recommendations:

First, the IO recommended "the initiation of a Special Forces Tab Revocation for [plaintiff]."[6] AR 22.

Second, the IO recommended "disciplinary action against [plaintiff] in the form [of] a General Officer Article 15." *Id.*

---

[6] The IO stated that "[i]n accordance with AR 600-8-22 (Reference e), a Soldier may be considered for a Special Forces Tab revocation where the 'Soldier has committed any act or engaged in any conduct inconsistent with the integrity, professionalism, and conduct of a Special Forces Soldier…' Maintaining a close personal (and likely sexual) relationship with [Mrs. White,] the wife of a subordinate NCO, is behavior which question the 'integrity, professionalism, and conduct' of [plaintiff]. As such, the initiation of a Tab Revocation action would be appropriate." AR 22.

Third, the IO recommended that [plaintiff's] commanding officer, Brigadier

General (BG) Edward M. Reeder, "request General Courts Martial Convening Authority

(GCMCA) jurisdiction from the I Corps Commander in order to impose disciplinary

action against [plaintiff]." *Id*.

Fourth, "[g]iven the substantiated findings, [plaintiff's] questionable

trustworthiness, and the limited opportunities for LTCs at 1st SFG(A)," the IO

recommended that the plaintiff "be assigned to a unit at Fort Bragg effective 1 October

2011.  This would also serve to facilitate the imposition of any administrative or

disciplinary actions." *Id*.

Finally, the IO noted that "there were several allegations that SFC White is

currently involved in a sexual relationship with a woman who is not his wife." AR 22.

Therefore, the IO also recommended "that a commander's inquiry be initiated into these

allegations." *Id*.

## C.   Disciplinary Action Resulting from the 2011 Investigation

Following the investigation, plaintiff's commanding officer, BG Reeder, took the

following disciplinary actions.

### 1.   Article 15

In September 2011, plaintiff was considered for punishment under Article 15 of

the UCMJ, 10 U.S.C. § 815. AR 97.  Although Article 15 proceedings are non-judicial,

plaintiff was provided the option to consult with counsel, present a defense, or refuse the

Article 15 and demand a trial by court-martial. AR 97.  He chose to proceed with the

Article 15 proceeding in a closed hearing and without an attorney. *Id.*

The "Record of Proceedings Under Article 15, UCMJ" dated October 20, 2011 specified that the conduct he was being punished for took place in 2011.  Specifically, it stated "[i]n that you, did at or near Joint Base Lewis-McChord, Washington, on divers [sic] occasions, between on or about January 2011 and on or about April 2011, wrongfully and dishonorably engaged in an inappropriate relationship with [Mrs. White]. . . in violation of Article 133," and "that you, a married man, . . . between. . . January 2011 and . . . April 2011, wrongfully have sexual intercourse with [Mrs. White] a married woman not your wife . . . in violation of Article 134." AR 97.  BG Reeder directed that DA Form 2627 be filed in the performance section of [plaintiff's] Official Military Personnel File (OMPF). *Id.*

Plaintiff appealed BG Reeder's decision. *Id.*  The record does not contain the plaintiff's appeal of the Article 15 punishment.  The plaintiff was given an opportunity to supplement the record with the record from the Article 15 appeal but failed to do so. (ECF No. 28).  he record was however supplemented by the government with the final determination of the appeal the plaintiff filed. (ECF  No. 31)  Based on the plaintiff's appeal, the reviewing judge advocate refused to set aside any of the findings, but determined that plaintiff should receive the two months of pay that he had forfeited as part of the Article 15 punishment.  AR 369-70.

### 2.     General Officer Memorandum of Reprimand

Earlier, on September 20, 2011, plaintiff received a GOMOR for his misconduct from 2001 through 2011. AR 34.  The GOMOR reprimanded plaintiff for engaging in "sexual relations with two prostitutes while in Thailand on a training mission in 2001"

and for admitting that he maintained a sexual relationship with Mrs. White "from 2001 until the present," while "married to another woman." *Id.*  In the GOMOR, BG Reeder Jr. explained that the GOMOR was "administrative in nature and is not imposed as punishment under the UCMJ." *Id.*

In his response to the GOMOR, plaintiff stated on October 6, 2011, "I accept responsibility for the consequences of my inappropriate sexual behavior a decade ago, my recent improper relationship with a woman other than my wife, and my disloyalty to a Special Forces Teammate, SFC Daniel White." AR 95.  He, however, explained in his response that he "drank heavily" in 2001, which resulted in behavior "that was unbecoming and out of character," and that in 2002, he was "diagnosed with cancer, underwent surgery, and subsequently made a number of marked changes" in his life. *Id.*

In his response, plaintiff further explained that when SFC White asked him about "the veracity of the Facebook allegation, and specifically, when it occurred" during their confrontation on April 26, 2011, he responded "2001, meaning that the incident . . . occurred in 2001." AR 95.  Plaintiff noted that he did not mean that the sexual relationship had continued since 2001. *Id.*  Specifically, he claimed that SFC White misunderstood when he exclaimed, "[S]ince 2001. You have been . . .[having sex with] my wife since 2001?" *Id.*  Plaintiff stated in his response that he tried to correct SFC White, but that SFC White was "extremely agitated" and "pointing a pistol" at him, and as a result, he was not able to explain his meaning to SFC White. *Id.*

### 3.      Revocation of Special Forces Tab

On September 20, 2011, plaintiff received a Memorandum of Intent to Initiate

Termination of CMF 18 Status and Removal of Special Forces Tab from Colonel, Special

Forces Brian R. Vines. AR 101.  The memorandum stated that the proposed punitive

actions were based on plaintiff's "inappropriate sexual relationship ('threesomes' with

[Mrs. White] and [Mrs. Emoto]) in the past" and for "currently having at minimum, an

inappropriate relationship as friends (going to dinner, the movies, the gym, and bowling)

with the spouse of a subordinate." *Id*.  The memorandum went on to state that "[e]ven in

the absence of a physical component it is inappropriate for a married officer to go on

dates with the married spouse of one of his subordinates." *Id*.  In this connection, the

memorandum notes that plaintiff admitted to SFC White that he was "having sex with . . .

[Mrs.] White since 2001." *Id*.  Colonel Vines concluded his memorandum by stating that

he was initiating the procedure for the removal of plaintiff's Special Forces Tab because

"in light of these circumstances," he did not believe that the plaintiff was "suitable for

further SF duty." *Id*.  On November 4, 2011, plaintiff's Special Forces Tab was revoked.

AR 108.

### D.      Retirement from Military

In April 2012, plaintiff submitted a request to retire effective June 30, 2012. AR

173.  In his letter to the Army Grade Determination Review Board ("AGDRB" or "grade

determination board"), plaintiff requested that he be "advanced on the retired list to the

highest grade" that he "satisfactorily held while on active duty . . .." AR 113.  He

acknowledged in the letter that Army Regulation 15-80 states, "'[g]enerally, service in a

16

grade will not be considered to have been satisfactory when reversion to a lower grade was expressly for prejudice or cause, due to misconduct, caused by nonjudicial punishment pursuant to Article 15, UCMJ, or the result of the sentence of a court-martial.'" *Id*. Plaintiff noted that despite the Article 15 nonjudicial punishment he received, he believed that he should be retired at Lt. Col. (O – 5) "on the basis that my service as a whole, including my service in the rank of Lt. Col., was satisfactory, the determination that I committed misconduct while serving as a Lt. Col. as evidenced by the nonjudicial punishment was erroneous, and the compassionate circumstances present in my case warrant retirement at Lt. Col." *Id*.

On June 11, 2012, the AGDRB determined that the highest grade he satisfactorily held was not as an O – 5, but as an O – 4. AR 103. In the grade determination decision, one of the board members noted:

> I could not find any proof other than the he said she said, of the 3-somes wife communicated to the SFC. She then later retracted her statement during the investigation. I could have gone with LTC even though he was short of the 3-year threshold I use. His duty performance was excellent & was reflected in OER. However, since there is 'doubt' about behavior dating back to 2001. I vote MAJ-O4.

*Id*. The grade determination board unanimously voted that plaintiff be retired as a Major (O – 4). *Id*.

Plaintiff retired voluntarily on June 30, 2012, AR 163, and was placed on the retired list in pay grade O – 4 on July 1, 2012. AR 12. At the time of his retirement, he had completed 21 years, 9 months, and 9 days of net active service. AR 165.

**E.      Plaintiff's Application to the Army Board for Correction of Military Records**

Plaintiff petitioned the ABCMR to "correct his records to reflect his retirement at the highest pay grade for which he would be eligible absent the above punishments, and that all pay and allowances withheld based on them, from the time of his retirement to present, be reimbursed." AR 45.  Specifically, plaintiff requested that the ABCMR "remove from his record the Article 15 nonjudicial punishment, which he received in October 2011, and the letter of reprimand [GOMOR], revocation of his Special Forces Tab and revocation of his Career Management Field 18 status that accompanied it, because all reflect punishments contrary to law." *Id*.  Plaintiff alleged that "the Army Grade Determination Review Board, and subsequently the Secretary of the Army, relied on the erroneous letter of reprimand, erroneous nonjudicial punishment, and evidence of misconduct that occurred over 10 years prior." *Id*.

With regard to the Article 15 proceeding, the plaintiff argued that the Article 133, Conduct Unbecoming an Officer and Gentlemen finding was not supported because there was not sufficient evidence to prove that he was engaged in a romantic relationship with Mrs. White in 2011 and because his actions did not affect his ability to command troops. AR 54-55.  He argued that his "conduct with [Mrs. White] wherein they went to dinner together, the movies, the gym, and generally spent time together after her separation, falls far short of the bar set in *Frazier*." AR 54 (citing *United States v. Frazier*, 34 M.J. 194 (C.M.A. 1992)).  Specifically, that unlike the officer in *Frazier*, he "did not cohabit with [Mrs. White] and most importantly the facts did not establish that they had entered into a romantic relationship." *Id*.  Plaintiff further argued that "[p]rior to their separations, and

18

the allegations, the Emotos and the Whites were friends and socialized together . . . ." *Id*.

He argued that "[c]ontinuing the conduct after the couples had separated from their

spouses is not easily recognizable as criminal, and does not amount to a violation of

Article 133." *Id*.

With regard to the Article 134, adultery finding, in the Article 15 nonjudicial

punishment, plaintiff argued that "the evidence is insufficient to support that [he], beyond

a reasonable doubt, had sexual intercourse with [Mrs. White in 2011]." AR 55.  Plaintiff

explained that the finding of adultery is inconsistent with the IO finding.  Specifically, the

IO did not find that plaintiff and Mrs. White were having a sexual relationship in 2011.

AR 56.  Instead, the IO found that plaintiff and Mrs. White were having "at a minimum

an inappropriate relationship." AR 77.  He also stated that he did not reside in the same

geographic area as Mrs. White for virtually the entire ten-year period during which an

ongoing affair is alleged, and therefore, could not have had a continuous sexual

relationship as SFC White claims. AR 56.  Additionally, the plaintiff argued that because

"there was no evidence of a current physical relationship between plaintiff and [Mrs.

White,] . . . it is likely that Brig. Gen. Reeder focused on the allegations of sexual

misconduct that occurred in 2001, rather than in 2011." *Id*.  Plaintiff claimed that the

allegations of conduct that occurred in 2001 could not serve as a basis for imposing

nonjudicial punishment because Article 43 limits nonjudicial punishment to offenses

occurring within two years of the punishment." AR 56-57; *See* Article 43(b)(3), UCMJ

("A person charged with an offense is not liable to be punished under section 815 of this

title (article 15) if the offense was committed more than two years before the imposition of punishment.").

With regard to the GOMOR, plaintiff went on to explain that, "[t]he GOMOR specifically seeks to punish [plaintiff] for sleeping with prostitutes while in Thailand in 2001 and sleeping with SFC White's wife in 2001.  Since 2001, there has been no additional allegations of [plaintiff] sleeping with prostitutes, and the only additional allegations of adultery or sleeping with a subordinates wife arises solely from SFC White, which, as discussed above, a continuous sexual relationship between [plaintiff]  and SFC White's wife is an impossibility." AR 58.  The plaintiff maintained that "[w]hile no specific regulation provides a statute of limitation for GOMORs" Army Regulation 600-37, which considers letters of reprimands, instructs officials to "consider the timeliness and relevance of the adverse information before taking administrative action at the later date." AR 57 citing Army Regulation 600-37, Ch.3-4(d)(3).  As such, the plaintiff maintained that the GOMOR was untimely and improper because it was based on conduct in 2001, which was ten years prior to the issuance of the GOMOR. *Id.*

Plaintiff also challenged the revocation of his Special Forces Tab and CMF 18 status on the grounds that these actions were based on the erroneously issued Article 15 non-judicial punishment and GOMOR. AR 58.

Plaintiff argued, based on his challenges to the Article 15, GOMOR and Special Forces decisions, that "[t]he AGDRB's decision to recommend retirement as a Major was in error because the board based its decision, not on [plaintiff's] actions as a Lieutenant Colonel, but on allegations of acts that took place when he was a Captain." AR 51.  In

seeking to have the AGDRB decision reversed, plaintiff also stated that his retirement "as a Major is unjust given his exceptional service as a Lieutenant Colonel, and his compassionate circumstances." *Id*.  Plaintiff explained that his four year old daughter has Cystic Fibrosis and that his second daughter, who is about 15 months old, both require financial support. AR 53.

### F.  Correction Board's Decision Denying Plaintiff's Application

On March 12, 2014, the ABCMR denied plaintiff's application for correction of his military records. AR 2.  The ABCMR stated that it considered the evidence from the investigation, the IO's findings, plaintiff's military records, and the memorandum of law he filed in support of his application together with the twelve enclosures he included. AR 3-15.

The ABCMR explained that it considered each of plaintiff's objections and concluded that the Army's retirement grade determination was supported and based on proper evidence. AR 13.  Specifically, the ABCMR explained that "[t]he available evidence does not substantiate counsel's contention that the IO relied solely on the allegation of [SFC White]." AR 14.  Rather, the ABCMR determined that "[t]he available evidence shows that the IO also relied on statements provided by other individuals and what he believed to be contradictory statements provided by the applicant's spouse and the spouse of [SFC White]." *Id*.

The ABCMR further explained that "[c]ontrary to counsel's contention, the IO did find that the applicant and [Mrs. White] had an inappropriate sexual relationship 'threesome' with [Mrs. Emoto] in the past and continued to have at a minimum, an

inappropriate relationship as friends." *Id*.  The ABCMR stated that the "available evidence shows that the applicant received a GOMOR as a result of his conduct from 2001 until at the very least April 2011." *Id*.  The ABCMR noted in this connection that "[i]n his rebuttal to the GOMOR [plaintiff] admitted to his marital infidelity." *Id*.  The ABCMR stated with regard to plaintiff's objections to consideration of his activities with prostitutes in 2001 that "[t]his information was properly included in the GOMOR as it shows a pattern of conduct unbecoming of an officer and a gentleman." *Id*.

The ABCMR found that plaintiff's "[c]ounsel's contentions regarding what he does not believe amounts to a violation of Article 133 are irrelevant." *Id*.  The ABCMR stated that "[this] determination was appropriately made by the IO and the imposing CG agreed." *Id.*  The ABCMR went on to state that "[a]lthough the record of NJP [plaintiff's appeal from the Article 15 punishment] is not currently filed in the applicant's official record, he submitted a copy showing that he elected not to stand trial by court-martial.  If the allegations made against him were false and/or untrue he was provided the opportunity to clear his name at a court-martial." *Id*.

The ABCMR went on to find that plaintiff's "Special Forces Tab was properly revoked by the awarding authority." *Id*.  The ABCMR explained that "the Special Forces Tab may be revoked by the awarding authority if the recipient has committed any act or engaged in any conduct inconsistent with the integrity, professionalism, and conduct of a Special Forces Soldier . . . ." *Id*.

The ABCMR concluded that "[n]either the applicant nor his counsel has shown error or injustice in the actions taken by the Army in his case." *Id*.  For these reasons, the

ABCMR upheld the AGDRB decision stating, the plaintiff's "records show his service in pay grade O-5 was not considered to be satisfactory" and the plaintiff "was placed on the retired list in the grade he satisfactorily held." *Id*.

### G.  Instant Action

On February 16, 2017, the plaintiff filed the instant action. (ECF No. 1) Plaintiff seeks the removal of the Article 15 non-judicial punishment, the GOMOR, his Special Forces Tab reinstated, and the reinstatement of his Career Management Field 18 status from his records.  Plaintiff also seeks correction of "his records to reflect his retirement at the highest pay grade for which he would be eligible absent the above punishments, and that all pay and allowances withheld based on them, from the time of his retirement to present, be reimbursed." Pl.'s Mot. for J. on the Administrative R. (MJAR) at 15.

The parties filed cross-motions for judgment on the administrative record. (ECF Nos. 15 and 18).  In his motion for judgment on the administrative record, the plaintiff argues: first, that the ABCMR erred by failing to set aside the Article 15 nonjudicial punishment on the grounds that there was insufficient evidence to support the finding of an inappropriate sexual relationship between plaintiff and Mrs. White in 2011, and thus there was not a sufficient basis for finding he had committed adultery in 2011; second, that the ABCMR erred in finding that the GOMOR was proper, when there was only credible evidence of a sexual relationship between plaintiff and Mrs. White in 2001 and not in 2011; specifically, plaintiff argues that he was improperly censured for behavior in 2001, which was beyond the limitations period; and third, that the ABCMR erred in affirming the AGDRB decision, which he claims could have only been based on behavior

in 2001 and not on plaintiff's conduct as a Lieutenant Colonel in 2011. Pl.'s MJAR.  In

particular, plaintiff argues that the ABCMR erroneously failed to address his argument

that actions from 2001 should have never been considered because Article 43(b)(3) of the

UCMJ bars non-judicial punishment from being based upon offenses occurring more than

two years later.[7] Pl.'s MJAR at 14.

The government argues, in response, that the ABCMR's decision is supported by

the evidence in the record and was not arbitrary or capricious. Def.'s Cross-Mot. for J. on

the Administrative R.  The government contends that plaintiff's disagreement with the

IO's factual findings is not sufficient to set aside the ABCMR's decision. *Id.*  According

to the defendant, the IO found and the ABCMR agreed after reviewing the evidence that

the plaintiff had an improper sexual relationship with Mrs. White in 2001 and 2011 and

that the Article 15 non-judicial punishment, the GOMOR, as well as the decision to

revoke his Special Forces Tab, are factually supported and procedurally correct. *Id.*  The

government argues that in such circumstance there is no basis for overturning the

AGDRB decision and that the ABCMR decision not to correct plaintiff's military record

or overturn the AGDRB decision should be affirmed. *Id.*

In his last response, plaintiff asserts that the government misstated his position.

More specifically, plaintiff contends that the ABCMR failed to address the statute of

limitations issue regarding the Article 15 violations and that "the board erroneously

inferred facts against [plaintiff] based on his choice to continue with the nonjudicial

---

[7] 10 U.S.C. § 843 states that "[a] person charged with an offense is not liable to be punished under section 815 of this title (Article 15) if the offense was committed more than two years before the imposition of the punishment."

punishment rather than a court martial." Pl.'s Resp. at 5.  Plaintiff also states that the

Army Regulation 15-6 investigation findings were not supported by substantial evidence;

rather, they were based on conduct that occurred between 2000 and 2001. Pl.'s Resp. at 7.

Plaintiff notes that "[t]he only evidence the IO found regarding his current friendship

with [Mrs. White] was 'friends that do things together . . .'" and that "it is inappropriate

for a married officer to be going on dates with a married spouse of one his subordinates."

Pl.'s Resp. at 7.  Plaintiff asserts that "this statement could only be true from 2000-2001."

*Id*.  Plaintiff further indicates that "the ABCMR's decision to deny the removal of the

GOMOR despite the evidence not supporting a 10-year sexual relationship as impossible,

and upholding a reprimand that includes conduct from over 10 years prior . . . [is]

arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Id*. at 9.

Lastly, plaintiff argues that the AGDRB improperly based its pay grade decision on

actions from 2001 before the plaintiff was a Lieutenant Colonel. *Id.*

In its last reply, defendant contends that plaintiff raises no justiciable challenge to

the Article 15 proceedings because the Article 15 proceedings were properly based upon

conduct in 2011 and that substantial evidence supports the findings. Def.'s Reply.

## II.   Jurisdiction

This court has jurisdiction over claims seeking money damages from the United

States.[8]  "The Tucker Act authorizes certain actions for monetary relief against the United

---

[8] The court requested that the parties address whether jurisdiction in this case is proper under the Military Pay Act, 37 U.S.C. § 204, or another statute such as 10 U.S.C. § 1370. In his response, the plaintiff contended that the court has jurisdiction under the Tucker Act, as well as 10 U.S.C. § 1370. Defendant contended that jurisdiction of this court is proper under 10 U.S.C. § 1370 and Army Reg. 15-80.

States to be brought in the Court of Federal Claims." *Spellissy v. United States*, 103 Fed.

Cl. 274, 281 (2012) (quoting *Martinez v. United States*, 333 F.3d 1295, 1302 (Fed. Cir.

2003)) (internal quotation marks omitted).  This extends to claims for retirement pay that

a service member would have received had the service member been properly classified

at his retirement. *See Spellissy*, 103 Fed. Cl. at 281-82. Specifically, 10 U.S.C. §

1370(a)(1) provides that a commissioned officer "shall . . . be retired in the highest grade

in which he served on active duty satisfactorily . . . ."  The court finds that this statute is

money mandating. *Id*; *see also Lewis v. United States*, 458 F.3d 1372, 1376 n. 2 (Fed.

Cir. 2006) ("Retirement pay claims are brought under other money-mandating statutes.

*See, e.g.*, 10 U.S.C. §§ 6323, 6333, 1370 . . . .").  In such circumstances, the court further

finds that it has jurisdiction over plaintiff's case.

## III.    Standards of Review

The standards of review in this case is dictated by plaintiff's decision to seek

correction of his military record before the ABCMR.  Once the ABCMR makes a

decision, the court is limited to reviewing that decision under the standards of review for

agency action.  *See Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010), *Metz

v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).  The fact that the plaintiff has

challenged his Article 15 punishment, the GOMOR, and the AGDRB decisions directly

does not alter the standards governing this court's review. *Houghtling v. United States*,

114 Fed. Cl. 149, 158 (2013).  The burden is on the plaintiff to establish by "'cogent and

clearly convincing evidence'" in the administrative record supplied to the court that the

ABCMR decision was arbitrary, capricious, unsupported by substantial evidence, or not

in accordance with law. *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (quoting

*Dorl v. United States*, 200 Ct. Cl. 626, 633, cert. denied, 414 U.S. 1032 (1973)) (internal

quotation marks omitted); *see also Porter v. United States*, 163 F.3d 1304, 1312 (Fed.

Cir. 1998). "Substantial evidence is such relevant evidence that a reasonable mind might

accept as adequate to support a conclusion." *Jennings v. Merit Sys. Prot. Bd.*, 59 F.3d

159, 160 (Fed. Cir. 1995).

## IV.   Discussion

The plaintiff contends that the decision of the ABCMR not to set aside the

AGDRB's retirement rank decision was based on the errors he identified in the Article 15

and GOMOR decisions and was thus arbitrary, capricious, contrary to law or unsupported

by substantial evidence.  He also argues that the removal of his Special Forces Tab was

arbitrary, capricious, contrary to law or unsupported by substantial evidence.  More

specifically, plaintiff contends that the ABCMR erred because the Article 15 and

GOMOR decisions, as well as the AGDRB decision, all hinge on a false finding that

plaintiff committed adultery with Mrs. White in 2011.  Plaintiff argues that there is no

clear evidence that he and Mrs. White had a sexual relationship in 2011.  According to

plaintiff, the only sexual relationship he had with Mrs. White took place in 2001 which

he argues is outside the statute of limitations for purposes of Article 15 non-judicial

punishment.[9]

---

[9] Unlike with GOMORs, actions that can be punished under Article 15 must have occurred within two years prior to the date the punishment was issued. 10 U.S.C. § 843. In this instance Mr. Emoto received his Article 15 non-judicial punishment on September 21, 2011 and thus argues only actions between September 21, 2009 and September 21, 2011 can be considered.

Plaintiff further argues that BG Breeder's conclusions in the Article 15 and GOMOR that plaintiff and Mrs. White had engaged in a sexual relationship that started in 2001 and continued through 2011 is not possible because the parties were stationed in different locations during most of that time. According to plaintiff, this error relates back to plaintiff's statement to SFC White during the confrontation at SFC White's home in April 2011 when plaintiff stated that he had been having sex with Mrs. White since 2001. *See* AR 188 (SFC White alleges that the plaintiff "admitted to me he had been . . [having sex with] my wife since 2001 and in the present 2011."); AR 95 (In the plaintiff's rebuttal to the GOMOR he does not contest that he stated "since 2001" in response to SFC White's question about the relationship between him and Mrs. White); AR 201 (SFC Austin's sworn statement in which he stated "I heard Dan [White] ask [plaintiff] how long have you been [having sex with] my wife? [Plaintiff] replied 'since 2001. I have been [having sex with] your wife since 2001.'"). Plaintiff argues that this evidence alone is not sufficient to prove by a preponderance of the evidence that he had an adulterous relationship with Mrs. White in 2011.[10] As such, plaintiff argues that he was improperly punished for sexual behavior in 2001. He argues that his sexual misbehavior in 2001 is outside the applicable statute of limitations. Plaintiff concludes in view of the foregoing that the Army's retirement rank decision rests on an Article 15 punishment for conduct outside the statute of limitations and an untimely GOMOR decision based on actions that

---

[10] The preponderance of the evidence standard derives from the Procedures for Administrative Investigations and Boards of Officers (Army Regulation 15-6, Section II, 3-10).

took place ten years prior.  Thus the plaintiff contends that ABCMR erred in upholding those decisions and the AGDRB's retirement rank decision.

The government argues in response that (1) the record is sufficient to support the ABCMR's affirmance of the Article 15 non-judicial punishment, the GOMOR, and AGDRB's decisions, and (2) plaintiff's timeliness argument is unsupported.

The court is not in a position to reconsider evidence or draw its own conclusions. The court does not serve as a "super corrections board." *Skinner v. United States*, 594 F.2d 824, 830 (Ct. Cl. 1979).  However, in applying the standards of review, this court must be assured that ABCMR considered plaintiff's objections and has provided an answer to the objections raised.  In addition, the court must review the ABCMR decision to ensure that it is supported by substantial evidence.

Plaintiff's only real challenge to the ABCMR's decision before this court is with regard to its affirmance of the 2011 adultery finding in the GOMAR and Article 15 nonjudicial punishment.  While the court may have reached a different conclusion than the ABCMR, the court finds applying well-settled standards of review, that substantial evidence supports the ABCMR's decision not to overturn the adultery findings against plaintiff for his actions in 2011.

First, although the plaintiff could not be found guilty of adultery under Article 15 for actions in 2001, plaintiff's behavior in 2001 is relevant to the finding of adultery in 2011.  Plaintiff's confession of a relationship in 2001 demonstrates that plaintiff had an intimate history with Mrs. White before 2011 and this history was reasonably considered

by BG Breeder in concluding that plaintiff had committed adultery in 2011 with the same woman.

Second, the fact that the evidence with regard to plaintiff having a sexual relationship with Mrs. White in 2011, is disputed, does not mean that the ultimate finding of adultery is not supported by substantial evidence. As noted above, fn. 4, the offense of adultery in the military requires three elements of proof: "(1) That the accused wrongfully had sexual intercourse with a certain person; (2) That, at the time, the accused or other person was married to someone else; and (3) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *Manual for Courts-Martial United States,* IV-103. The plaintiff does not challenge the government's proof regarding elements 2 and 3. Rather, the focus of plaintiff's case is on whether there is substantial evidence to support the finding that plaintiff had a sexual relationship with Mrs. White in 2011.

A review of the record establishes that the primary evidence of a sexual relationship in 2011 comes from plaintiff's statement to SFC White to the effect that he had been having sex with SFC White's wife "since 2001." AR 188-89; *see also* AR 95. Plaintiff does not deny making that confession to SFC White. Nor could he. SFC Austin heard plaintiff's statement over the phone. Indeed, both SFC White and SFC Austin provided sworn statements regarding what they heard plaintiff say. AR 189, 201. As such, the finding of adultery is not based on SFC White's word alone. The finding is based primarily on plaintiff's admission to SFC White. In addition, SFC White also

swore in his statement that his wife, Mrs. White, had admitted to an ongoing affair with plaintiff in 2011.  AR 189.  Although Mrs. White later denied any sexual relationship with plaintiff, the IO found that Mrs. White was not a credible witness.  In contrast, the IO found that SFC White was a very credible witness. AR 21.

The record also shows that the plaintiff's confession was credible in the context of the other evidence collected by the IO. For example, an ongoing relationship was corroborated by the text Mr. Emoto received from Mrs. White where she said she "missed" the plaintiff.  Also there was the undisputed evidence of dinners and other private meetings between the plaintiff and Ms. White.

The plaintiff's explanations of his [since 2001] statement after receiving the GOMOR are insufficient for the court to conclude that the government's reliance on plaintiff's confession of a sexual relationship in 2011 to SFC White was arbitrary and capricious.  First, the plaintiff argued that what he meant when he said that he had been " . . . [having sex with] his wife [Mrs. White] since 2001" was that he had not had a sexual relationship with Mrs. White since 2001.  AR 95.  He plainly did not say that. Second, plaintiff's contention that he could not clarify his statement at the time because SFC White was holding a gun to his head was not found to be credible based on the statements of both SFC White and SFC Austin.  Third, plaintiff's claim that he could not have had a relationship with Mrs. White "since 2001"  because he and Mrs. White were not living near each other for much of the 10 years is not relevant in that the evidence established that they were in the same area in 2011, during the period when he was charged with adultery.

The court finds that in such circumstance the ABCMR decision meets the substantial evidence standard.  This court, like the ABCMR, must defer to the IO's credibility determinations. *See Stine v. United States*, 92 Fed. Cl. 776, 796 (2010). Plaintiff's challenge to the ABCMR decision on the grounds that there was not substantial evidence to show he had sexual relationship with Mrs. White in 2011 must be rejected.

In view of the foregoing, plaintiff's challenge to the ABCMR's decision on the grounds that he has been punished for sexual activity in 2001 outside the applicable statute of limitations also must be rejected.  The court affirms the ABCMR's conclusion that plaintiff was not found liable for adultery in 2011 based on his actions in 2001. Rather, plaintiff was found guilty of adultery based on his actions in 2011 during the period of time that plaintiff was in the same location as Mrs. White.

Finally, because the plaintiff does not challenge the ABCMR's decision regarding the other 2 elements for finding plaintiff guilty of adultery, the court concludes that there is no other basis for overturning the ABCMR decision.  With regard to those additional elements, there was no dispute that plaintiff and Mrs. White were married to other persons while they were engaged in a relationship in 2011.  There is also substantial evidence to show that plaintiff's conduct was prejudicial to good order.  Once the history of plaintiff's relationship with Mrs. White became known, SFC White made it clear that he intended to broadcast plaintiff's behavior to his fellow service members.  The record explains in detail why plaintiff's behavior was prejudicial to good order and a discredit to the armed forces.

For all of these reasons, there is no basis to overturn the ABCMR's decision not to change plaintiff's retirement status from pay grade O – 4 to pay grade O – 5 or to correct his record by removing a non-judicial punishment issued under Article 15 of the UCMJ, removing the GOMOR, and reinstating his Special Forces Tab.

## CONCLUSION

For the above-stated reasons, the plaintiff's motion for judgment on the administrative record is **DENIED** and the government's motion for judgment on the administrative record is **GRANTED**.  The clerk shall enter judgment accordingly. No costs.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge